## LANE v. LODGE; and *vice versa*.

</div>

1. The petition as amended set out a cause of action, and was not subject to general demurrer on any of the following grounds, viz.: it sought a recovery on facts arising after its filing; it appeared therefrom that there was no consideration moving to the defendant to support the contract for the breach of which the suit was brought; and it appeared that such contract was wanting in mutuality.

2. The court erred in not sustaining the special demurrers to paragraphs 4, 5, 6, 7, and 8 of the last amendment allowed to the petition, for the reason that the matters set forth therein were irrelevant.

3. The evidence for the plaintiff was sufficient to take the case to the jury, and the court erred in granting a nonsuit.

(*a*) In an action for specific performance, damages for the breach of the contract may be recovered where for any cause the specific performance is impossible; therefore, in view of the evidence in this case, the nonsuit should not have been granted on the ground that the plaintiff sued on one cause of action and sought to recover on another.

(*b*) A contract of partnership is not required to be in writing, although at the time it is entered into it is agreed that the partnership will purchase certain turpentine business, which includes leases of land for turpentine purposes, and personalty used in such business, of the value of more than fifty dollars.

<div align="center">DECEMBER 11, 1912.</div>

Equitable petition. Before Judge Frank Park. Grady superior court. September 6, 1911.

The substance of the petition as finally amended was as follows: The plaintiff, J. W. Lane, and the defendant, G. F. Lodge, on September 15, 1910, entered into an agreement to form a partnership for the purpose of conducting a turpentine business. They agreed that Lodge should purchase the interest of one McElvey in the firm of McElvey & Lodge, then engaged in such business— Lane and Lodge each to "put up" $1,000 in cash to be paid to McElvey. The balance of the purchase-price was to be paid McElvey, $9,000, for certain specified personalty connected with the business, and a named per cent. on the accounts of the laborers employed by McElvey & Lodge, as well as 100 per cent. for the stock of commissary goods and uncut timber belonging to that firm. Lodge and Lane were each to pay $1,000 cash, and were jointly to borrow the balance of the purchase-price to be paid McElvey. After the completion of such arrangements, Lodge should convey to Lane a half interest in the business so purchased, and the business should be conducted by them as partners. Two days after the contract was entered into between Lodge and Lane, they, in pursuance thereof, went to Savannah and as partners made an arrangement with the Carson Naval Stores Company to borrow the sum necessary to pay McElvey, and notified McElvey that they were ready to make such payment. He informed them that he was not ready to receive the money, as he had not ascertained the exact amount of the firm's accounts and the exact value of the uncut timber. He at that time agreed to deliver the business and all of the property connected therewith to Lodge & Lane on September 19, and that he would receive from them the full purchase-price at an early date, when the total amount due should be accurately ascertained, and that ·upon the payment thereof he would formally convey to Lodge title to the business and the property connected therewith. Lodge & Lane then employed McElvey to manage the business for them as partners, from September 19 until the payment of the purchase-money and the execution of the conveyances, as above stated. McElvey, on Monday, September 19, 1910, placed Lodge & Lane, as partners, in possession of the business and all of the property connected therewith, for which they had bargained, and they employed McElvey to manage the business for the new

partnership. During the week commencing September 19, Lodge & Lane, as partners, conducted the business through McElvey as their agent and manager, their employees chipping and pulling the trees and dipping and hauling the gum to the still and incurring an indebtedness in operating the business in the amount of about $250. On September 26, 1910, Lodge "received said business out of the possession of the said G. B. McElvey as agent and employee of Lodge and Lane, and on said date placed G. L. Dickerson in control of the same as a partner with him, the said Lodge, to the absolute exclusion of petitioner," and Lodge and Dickerson have since been in possession of the business and property. Lane at all times since his contract with Lodge has been able, ready, and willing to pay his portion of the purchase-price, and has, at various times since the conclusion of such contract with Lodge, offered to perform his part of the agreement, which offer and tender Lodge at all times declined, and refused to convey to Lane a half interest in the business and property as contemplated by the contract between them. Lane "is ready and willing to do equity in the premises." The prayer of Lane's original petition was for a decree against Lodge for specific performance, but by an amendment this prayer was stricken and a prayer for damages inserted in lieu thereof,—the damages claimed being the difference between the purchase-price of the property and its market value at the time of the breach of the contract by the defendant, Lodge, the price and the market value being set forth. One of the paragraphs of an amendment allowed to the petition was as follows: "Plaintiff further alleges that the value of said property consisted largely in turpentine leases or the privilege to work for turpentine purposes the pine trees of others, for periods of time ranging from 1 to 3 years, most of the leases, however, being for not more than three years; that at the time petitioner contracted to purchase said interest in said property and at the time of filing said suit there was then in the boxes and on the trees crude material from which could have been made not less than 150 barrels of spirits of the value of $5,250.00 or other large sum, besides a large quantity of rosin, all of which, since the filing of said suit, said Lodge & Dickerson have removed and sold, and, with the exception of one or two days while under a restraining order, which was soon dissolved, they have continuously worked the said property for turpentine purposes up to

this date, to wit, May 17, 1911, selling the products as obtained, in large amounts peculiarly within the knowledge of defendants, but not within the exact knowledge of plaintiff, and have thereby in a very material way changed said property from its condition at the time of the filing of said suit, so that it appears that since said suit was filed it has, without fault on the part of petitioner, become impossible for the said G. F. Lodge to convey to the petitioner the one-half undivided interest in said property as it was when he contracted for the same." In another amendment allowed to the petition were the following paragraphs:

"4. During all of the negotiations which led to the making of said contract between the plaintiff and the defendant, it was well known to the defendant Lodge that petitioner was desirous of entering into the turpentine business, and that petitioner had recently sold all his interest in the Pearce Drug Company in order that petitioner might enter the turpentine business; it being further well known to the defendant that petitioner was at that time seeking to purchase a turpentine business location; whereupon petitioner, being approached by the defendant Lodge with the proposition aforesaid, did cease any further efforts to purchase a turpentine business elsewhere and did enter the contract aforesaid with defendant.

"5. That during the time that petitioner and the said Lodge were considering the formation of said partnership and continuously thereafter during the remainder of the year 1910, naval stores (for the manufacture of which petitioner and defendant entered their said contract) continued to advance in price from day to day, so that between September 15, 1910, the date when petitioner and defendant made their said contract, and September 26, 1910, when petitioner first learned that defendant had breached the same, spirits advanced from 71¾ cents per gallon to 74 cents per gallon, selling for as high as 76 cents per gallon on September 20, 1910, rosin advancing likewise.

"6. At the time petitioner and defendant formed their said contract the prospects for good profits in the naval stores business were becoming brighter and more favorable each day, and the values and price of turpentine locations and properties were advancing accordingly.

"7. So that after defendant had breached said contract peti-

tioner went back into the market endeavoring to purchase a turpentine location and business elsewhere, but found that prices had advanced for same and he was unable to purchase any turpentine business or property at valuations as low relatively as he could have done before the formation of his contract with the defendant, and, being unable to find any suitable turpentine business or property, was compelled to give up the idea of entering the turpentine business altogether.

"8.  By reason of all the facts above alleged and of other facts alleged in petitioner's original petition as heretofore amended, with reference to all of which this allegation is made, petitioner further alleges that it would be a fraud upon him and grossly inequitable for the defendant not to be bound to his contract with petitioner as heretofore alleged, and for the defendant not to pay unto this petitioner the damages which he has sustained by reason of the breach of said contract by the defendant as alleged in plaintiff's original petition as heretofore amended."

The petition as amended was demurred to generally and specially. The demurrers were overruled.  On the trial, at the conclusion of the evidence for the plaintiff, the court granted a nonsuit.  The plaintiff excepted to this ruling, and the defendant to the overruling of the demurrers.

*R. C. Bell,* for plaintiff.  *Russell & Custer,* for defendant.

FISH, C. J.  (After stating the foregoing facts.)

1.  We will first deal with the cross-bill of exceptions, wherein error is assigned upon the overruling of the demurrers to the petition.  As to the general demurrer, the only points referred to by counsel for plaintiff in error in the cross-bill are:  (a) that the petition as amended seeks to recover upon facts arising after the commencement of the suit; (b) that there was no consideration moving to the defendant to support the alleged contract for the breach of which the action was brought; (c) that there was no mutuality of contract.  There is no merit in any of these points. The petition as finally amended clearly sought to recover for the alleged breach of the contract of partnership between plaintiff and defendant, which breach, as appears from the petition, occurred prior to the filing of the suit.  So much of the petition as referred to the operation of the turpentine business by Lodge after the institution of the suit was not for the purpose of recovering dam-

7

ages for the turpentine, etc., which he took from the premises, but was set forth to show the inability of the defendant to specifically perform his contract.

The petition shows that the contract between plaintiff and defendant to enter into a partnership was not without consideration. The alleged articles of agreement averred mutual and dependent covenants, which constituted a valuable consideration from each party to the other. *Anderson* v. *Brown, 72 Ga.* 713 (*2a*). See also *Booth* v. *Saffold, 46 Ga.* 278; Civil Code, § 4246.

In *Mann* v. *Bowen, 85 Ga.* 616 (11 S. E. 862), it was said: "This was a parol contract to form a partnership in the future; and the law is well settled that where two persons enter into a contract to form a partnership, and one of them refuses to comply with his part of the contract, the other has a cause of action against him for the breach thereof. If it was a partnership already formed, we think it is equally well settled that if one of the parties refuses to permit the business to be launched, the other party has a cause of action." One of the grounds of demurrer which was there held not good was that "the contract referred to was not to be performed within a year from the time of its making." Many authorities were cited to sustain the principle announced. So in 30 Cyc. 465, it is stated that an action at law will lie for the breach of an agreement to enter into a partnership, and also for the breach of individual stipulations between the partners, although these may be contained in the partnership articles, and in this country it will also lie for the wrongful ouster of a partner from the firm. Many cases are cited to sustain the text. It follows that the alleged contract was not without mutuality, and that an action would lie for its breach.

2     Paragraphs 4, 5, 6, 7, and 8 of the last amendment to the petition, which are quoted in the statement of facts preceding this opinion, were specially demurred to as alleging irrelevant matters, and because they set forth no cause of action against the defendant. The special demurrers to these paragraphs should have been sustained. Under the allegations of the petition as amended, the plaintiff sought to recover the difference between the contract price of the business and the property connected therewith—the subject-matter of the partnership agreement—and the market value thereof, if greater than the contract price at the time of the alleged

breach of the contract by the defendant. The allegations of the paragraphs in the amendment under consideration were therefore irrelevant.

3. Did the court err in granting a nonsuit? The evidence submitted in behalf of the plaintiff tended to prove all the material allegations of the petition as amended; and therefore the nonsuit should not have been granted. Counsel for Lodge, defendant in error in the main bill of exceptions, contend in their brief that the nonsuit was properly granted, for the following among other reasons:

(a) Because " . . one can not sue on one cause of action and recover on another cause of action. The petitioner alleged that it was agreed that Lodge should buy the property for nine thousand dollars for certain described items and pay seventy-five cents on the dollar for the laborers' accounts, except one for which he should pay one hundred cents on the dollar, and should pay one hundred cents on the dollar for the stock of goods and all timber uncut. The plaintiff testified that: 'For all timber we were to pay more than he gave for it; the exact amount I can't say.' It thus appears from the plaintiff's evidence that the amount to be paid for the timber was not fixed by the parties. The price was left in the air, and no means was furnished by which the court could fix the price." The point that plaintiff brought suit on one cause of action, and sought to recover on another, was not well taken. An action for specific performance may by amendment be changed into one to recover damages, when it appears that the specific performance is for any reason impossible. Civil Code, § 4639. *Causey* v. *Causey*, 106 *Ga.* 188, 193 (32 S. E. 138). There was evidence to show that the value of the uncut timber was to be ascertained after the contract of partnership was made, and McElvey testified in behalf of the plaintiff that the value of the uncut timber amounted to $610. He also testified as to the value of the commissary stock, which was ascertained by taking stock, and as to the amount of the laborers' accounts, and that under his contract with Lodge the latter was to pay these in addition to the $9,000.

(b) Because, "It was alleged that McElvey & Lodge contracted to sell to Lodge, and that it was understood between the parties that when the conveyance was made to Lodge, he was to make a conveyance to Lane for one half interest. The plaintiff's evidence

shows that the conveyance was never made to Lodge, but that Mc-
Elvey sold the business on Saturday to Dickerson and was paid
for it by him, and that conveyance was never made to Lodge, that
he was never in position to make a deed to Lane. It appears that
if any wrong was done the plaintiff, it was done by McElvey and
not by Lodge." Neither is there any merit in this point. McElvey
testified: "I did not know anything about Mr. Dickerson coming
in the business until Saturday. I contracted with him on Saturday,
and he paid me for it. I did not know anything until then about
Lane going out and Dickerson coming in." He further testified:
"Mr. Lodge gave me a draft for the amount due on the following
week, and I acknowledged the settlement by wire." It was for
the jury to pass on this testimony, and determine what weight and
effect they should give it. Moreover, it could be legitimately in-
ferred from the evidence in behalf of the plaintiff that if no con-
veyance was ever made by McElvey to Lodge, it was because of
the latter's own acts in taking Dickerson into the partnership.

(c) Because, "It was alleged that petitioner tendered the money
agreed upon to Lodge and that Lodge declined to receive same.
Plaintiff testified: 'Under the contract I was to pay Mr. McElvey,
and for this reason I offered to pay Mr. McElvey instead of
Lodge.'" As there was evidence tending to show that the defend-
ant, Lodge, by taking Dickerson into the partnership and thereafter
taking from the premises large quantities of turpentine and selling
the same, and by repudiating the alleged partnership agreement
between himself and plaintiff, placed it beyond the power of de-
fendant to comply with his covenants in such agreement. Lane,
the plaintiff, was not, under the circumstances, bound to make any
tender to Lodge, nor to McElvey, after the latter had conveyed the
property to Lodge, nor to Lodge & Dickerson.

(d) Because, "The alleged agreement was in parol and related
to certain lands and for the purchase of goods to the amount of
more than fifty dollars, and should therefore have been in writing
in order to be binding upon Lodge." We can not agree to this con-
tention. The contract between the plaintiff and the defendant to
enter into a partnership for the purpose of operating a turpentine
business and to purchase such a business from McElvey & Lodge
or McElvey's interest in such business (although the business to be
purchased consisted in part of certain leases of lands for turpentine

purposes and of personalty connected with the business of the value of more than $50) did not fall within the statute of frauds, and was not required to be in writing. The part of the partnership agreement as to the purchase of the turpentine business was but an incident of the contract of partnership. It provided for the subject-matter and manner of investment of the capital of the firm. It was merely an agreement that the partnership would buy such business. It was nothing more than an agreement that the partnership should buy an interest in lands and personalty of another, which should be held as partnership property. Pennypacker v. Leary, 65 Iowa, 220 (21 N. W. 575); Falkner v. Hunt, 73 N. C. 571; Connell v. Mulligan, 21 Miss. 388; Davenport v. Buchanan, 6 S. D. 376 (61 N. W. 47); Fountain v. Menard, 53 Minn. 443 (55 N. W. 601, 39 Am. St. R. 617); Wood on Statute of Frauds, § 233; Browne on Statute of Frauds, § 262; Mann v. Bowen, 85 Ga. 616 (11 S. E. 862).

Nor was the plaintiff, under the facts of the case, bound to offer to the defendant a conveyance to be executed by the latter to the former and to pay the cost of such conveyance; nor did the evidence show that the contract of partnership was entered into on Sunday.

It follows from what has been said, that the judgment on the main bill, as well as that on the cross-bill of exceptions, must be

Reversed. All the Justices concur.